Memorandum of Decision
On December 11, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Carlos S., Sr., and Ada M. to their minor child, Carlos S., Jr., and to terminate the parental rights of Jimmy J. and Ada M. to their minor child, Sheila J. A consolidated trial of the petitions took place on November 15 and December 6, 7, and 10, 1999. For the reasons stated below, the court grants the termination petitions. CT Page 701
FACTS
The court finds the following facts and credits the following evidence.
A. The Mother and the Children
The mother is currently twenty-six years old. She was born in Puerto Rico but went to secondary school, through the eleventh grade, in Connecticut. She then returned to Puerto Rico where, in 1990, she had a daughter, Nilsa M., through a nonmarital relationship with Carmelo C. In 1993 and 1994, she had two more daughters, Irma S. and Ada S., through a nonmarital relationship with Carlos S., Sr. Carlos S., Sr., was physically abusive to the mother during their relationship.
The mother and Carlos S., Sr., returned to Connecticut and had a third child together, Carlos S., Jr. (hereinafter "Carlos"), in May, 1995. In July, the mother was kicked in the abdomen in a gang fight and tested positive for cocaine. DCF first became involved with the family in August, 1995, when Carlos went to the hospital due to a dog bite to his scrotum. In October, 1995, DCF received confirmed referrals that the mother's household was unclean, that she had not properly fed the children, and that the mother and several teenagers were smoking marijuana around the house.
Carlos went to live with Divina Z., a close friend of the family, in November, 1995. The mother began a relationship with Jimmy J.[2] DCF referred the mother to a family preservation program and Jimmy J. to drug evaluation, but neither followed through. The mother failed to visit Carlos or express interest in his well-being. In May, 1996, the mother was the victim of domestic violence precipitated by Jimmy J. On several occasions, she left the children unattended. As a result of these incidents, DCF obtained an order of temporary custody and placed all four children in foster care.
In the late summer of 1996, Jimmy J. went to prison and was ultimately sentenced for a series of narcotics-related offenses. The court adjudicated the four children neglected on October 4, 1996. On November 15, 1996, after Jimmy J. was in prison, a daughter, Sheila J., was born to him and the mother. Mother and daughter tested positive for cocaine at the time. On that basis, CT Page 702 DCF obtained an order of temporary custody for Sheila. DCF placed her in the same foster family as Irma and Ada. The court adjudicated Sheila neglected on January 16, 1997, entered expectations for the mother to follow, and committed all five children to DCF custody for one year.[3] Carlos returned to the custody of Divina Z., who had become a licensed foster mother.
DCF referred the mother to parenting classes, domestic violence counseling, and drug evaluations in 1997, but the mother failed to participate meaningfully. She denied the need for domestic violence counseling. The mother used cocaine occasionally through December, 1997. She began a relationship with Christian C.[4] and, on December 8, 1997, they had a boy, Christian Monico C.
In January, 1998, the mother appeared for and tested negative at a drug evaluation. She enrolled in a drug treatment and life skills program in April, 1998 and completed it in December, 1998, testing negative for drugs throughout the program. The mother also started parenting skill classes in January and completed them in July, 1998. She voluntarily attended parenting classes thereafter.
Christian C. was physically abusive to the mother, culminating in Christian C.'s arrest for an assault in July, 1998. Christian C. was sentenced to two years in prison for the domestic assault, possession of narcotics, and violation of probation. The mother also had an encounter with Carlos S., Sr., in September, 1998, in which Carlos S., Sr., threatened her. DCF referred the mother to the Salvation Army domestic violence program. The mother attended but did not see the need for such counseling. The program ultimately concluded that they could not help the mother. The mother has recently enrolled in another domestic violence program.
DCF offered the mother weekly visitation with her children. The mother was inconsistent in attending. The mother, who gave birth to another boy, Christian Yomar C., in March, 1999, had difficulty handling all of the children together. Carlos was particulary aggressive and did not pay attention to his mother. The mother did not set limits for him and admitted that she could not control him. In June 1999, DCF took Carlos out of the group visits and established separate visits with him. As a result, Carlos was quieter and followed directions better. CT Page 703
Carlos remains a difficult child with speech and language delays and attention deficit disorder. He is in an early intervention special education program. The mother has not inquired about Carlos's need for special programs. Carlos is not emotionally attached to his natural mother or father. Instead, he has an emotional bond with his foster mother, whom he calls "Ma." The foster mother has been successful in calming Carlos and in providing him structure. The foster mother would like to adopt Carlos if he became available.
Sheila has lived her entire life with her foster parents and her sisters Irma and Ada. Sheila is a well-adjusted girl. At a visit in October, 1998, the mother did not recall that it was Sheila's birthday. Upon separating Carlos from the rest of the family, DCF increased the mother's visits with the girls to three hours per week. Sheila was reluctant to go to some visits. At the visits, Sheila identifies Ada M. as "Mommy" but is reserved toward her. Sheila appears interested in getting to know her mother but far more comfortable and attached to her sisters and her foster parents. The foster parents would like to adopt Sheila if she became available.
The mother has been more affectionate with the three older girls. Nilsa, who has lived in separate foster homes from her sisters, receives therapy for behavioral problems. She has a strong emotional attachment to her mother and states that she wishes to return to her. DCF's current plan for her is reunification. If that reunification succeeds, DCF would then seek to reunify the mother with Irma and Ada, who also have positive memories of their mother.[5]
To facilitate this possible reunion, and because of concerns, stemming from a May, 1999 psychological evaluation, that the mother was depressed, DCF has recently referred the mother to a family reunification program. The mother has been living in a studio apartment for over a year with her two youngest boys. For a period of time, Christian Monico was under DCF protective supervision, but that supervision has now been removed. The two boys appear to be clean, well fed, and well clothed, but the family needs a larger living space, which the mother and her social works have been attempting to find. As of October, 1999, the mother had started work, but has no significant work history. The mother forswears an interest in having more children. She has stated that will not resume any of her prior relationships with men, including Christian C., who may be released from prison CT Page 704 in 2000, and that she prefers to be single. In testifying at trial, however, she denied that there was an incident of domestic violence with Christian C. in July, 1998.
B. Carlos S. Sr.
Carlos S., Sr., was born in Puerto Rico in 1974. He was incarcerated in January, 1995 for sale of narcotics. He visited monthly with Carlos, Irma, and Ada at the prison until sometime in 1998. He also made several inquiries of DCF concerning the well-being of his children and wrote them one or two letters.
In July, 1998, Carlos S., Sr., was released from prison. He did not maintain contact with DCF. He was arrested in September, 1998 for threatening the mother and for possession of narcotics. In November, 1998, he moved back to Puerto Rico and continues to reside there. He has not provided any financial support for Carlos. Carlos has negative memories of and little, if any, positive feelings about his father.
Carlos S., Sr., appeared for the first morning of trial but then failed to appear for the remainder. He reportedly returned to Puerto Rico before the conclusion of the trial.
C. Jimmy J.
Jimmy J. was born in Puerto Rico in 1978. He attended school there until the eleventh grade. Between January and October, 1996, before his daughter Sheila was born, Jimmy J. was arrested three times for narcotics-related offenses. Ultimately, he was convicted of sale and possession of narcotics, failure to appear in court, and violation of probation and given a net effective sentence of forty-two months in prison. He is subject to release in April, 2000.
The mother did not originally name Jimmy J. as Sheila's father and Jimmy J. did not initially request visits with Sheila. When the mother named Jimmy J. as the father in early 1997, DCF contacted him at the prison and discussed placement possibilities. He did not ask for a visit until his second conversation with DCF. He then had two visits with Sheila and two more were canceled due to DCF transportation problems. The father did not contact DCF asking for more visits after April, 1998. He has not since inquired of DCF or of Sheila's caretaker about Sheila's well-being. DCF did not provide any services to Jimmy J. CT Page 705 because he was in prison. Sheila has no present, positive memories of her father.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112(c)(1).[6] The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section17a-110 or section 17a-111b [dealing with permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112(c)(1). In this case, the court found, on January 15, 1998, that reasonable efforts to reunify the children were appropriate "as to all respondents until April 15, 1998." See Order of Commitment (Jan. 15, 1998). While the logical inference from that order is that efforts to reunify were no longer appropriate after April 15, 1998, the court never affirmatively made a finding to that effect. Accordingly, pursuant to § 17a-112(c)(1), DCF retained the burden of proving reasonable efforts at the termination trial.
The court finds that DCF has met its burden. DCF referred Jimmy J. to a drug evaluation early in the case, but he did not attend. He went to prison in late summer, 1996, where he presently remains. Carlos S., Sr., was in prison from January, 1995 to July, 1998, and then several months later moved to Puerto Rico. DCF offered both fathers, while in prison, the opportunity to visit with their children. Although this record shows that DCF did not offer either father an abundant amount of reunification services, the court finds that the fathers were "unable or unwilling to benefit from reunification efforts" due to their lengthy prison terms or absence from the state. General Statutes § 17a-112(c)(1).[7]
Over a period of more than three years, DCF offered the mother substance abuse evaluation and treatment, parenting skill classes, domestic violence counseling, a family reunification program, a psychological evaluation, and visitation. DCF continues to work with the mother because of its involvement with CT Page 706 the three oldest girls and its interest in the two youngest boys. Based on these facts, the court finds by clear and convincing evidence that DCF has made reasonable efforts to reunify Carlos and Sheila with their mother.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112(c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
The adjudicatory date for the mother and for Carlos S., Sr., is December 28, 1999, the date of filing of the original petition. DCF amended the petition with regard to Jimmy J. on September 30, 1999, which becomes the adjudicatory date for him. As amended, and after motions at the close of DCF's case, the petitions allege the grounds of abandonment against both fathers, failure to rehabilitate against the mother for both children, and lack of an ongoing parent-child relationship against Carlos S., Sr., and the mother with regard to Carlos.[8] The Court finds that DCF has proven these grounds by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210. CT Page 707
Neither father maintained the requisite degree of interest, concern, or responsibility in his child. Although both fathers were in prison for much of the adjudicatory period, incarceration alone is neither a complete defense to nor sufficient proof of abandonment. See In re Juvenile Appeal (Docket No. 10155),187 Conn. 431, 443, 446 A.2d 808 (1982). While in prison, Carlos S., Sr., visited his children monthly and occasionally sent them letters or inquired about them. Upon his release in July, 1998, however, the father did not maintain contact with DCF or his children and eventually moved back to Puerto Rico. He has not provided Carlos financial support. Jimmy J. did not originally or promptly request visits with Sheila. He did have two visits with her and two more were canceled through no fault of his own. After April 1998, and through the end of his adjudicatory period in September, 1999, however, Jimmy J. "did not request visits and did not even inquire about Sheila's well-being. This evidence establishes clearly and convincingly that both fathers abandoned their children.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). No dispute exists that, on October 4, 1996 and January 16, 1997, the court adjudicated Carlos and Sheila, respectively, to be neglected, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether CT Page 708 the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D.,51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
Although DCF did not offer Jimmy J. any services, he has nonetheless failed to rehabilitate within the meaning of the statute. The father was in prison for the entire adjudicatory period. He is not subject to release until April, 2000, and even this release date is uncertain. He has only seen Sheila twice in his life and is essentially a stranger to her. Sheila is attached to her foster parents. This evidence establishes clearly and convincingly that, as of the end of the adjudicatory period in September, 1999, the father has failed to achieve "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1).
The mother has made progress in recovering from drug abuse and in improving her parenting skills. She ultimately attended domestic violence counseling during the adjudicatory period, although she did not see the need for it or benefit from it. Despite all the counseling, the mother's choice of partners remained poor. The mother did not maintain income or housing that would be adequate for more than the two children already living with her. The mother was inconsistent in attending visitation sessions with Carlos and Sheila. She did not take interest in Carlos's special needs or, in October, 1998, remember Sheila's birthday. As a result, the mother has little relationship with Carlos and her relationship with Sheila is limited. The court accordingly finds by clear and convincing evidence that the mother has failed to rehabilitate in that she has not "gained the ability to care for the particular needs of the child[ren] at issue" In re Danuael D., supra, 51 Conn. App. 840, and therefore has failed to rehabilitate.
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the CT Page 709 relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646.
In the present case, the evidence is undisputed that Carlos has negative memories of his father and little, if any, positive feelings toward him. Carlos is also not attached emotionally to his natural mother. Instead, he is attached to his foster mother. The court accordingly finds that DCF has proven the ground of no ongoing parent-child relationship against both parents by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The best interest of Carlos and Sheila clearly and convincingly requires termination of the parental rights of their biological fathers. Both fathers have abandoned their children. Carlos S., Sr., failed to appear for most of the trial and now resides in Puerto Rico. Jimmy J. has been in prison for Sheila's entire life. Neither father has any relationship with his child.
For different reasons, the court reaches the same conclusion for the mother. The mother failed to rehabilitate during the adjudicatory period and still has little relationship with Carlos. Although she claims to have no further interest in relationships with men, her failure to admit at trial that Carlos CT Page 710 S., Sr., was abusive to her reveals that she still does not fully understand domestic violence and the impact it can have on children. There are also unresolved concerns about the mother's mental health. The mother has improved her parenting abilities, as evidenced by the fact that she has never lost custody of her two youngest boys and DCF is considering reunification of her three oldest girls. But with no record of employment and only a small studio apartment, and with all her other concerns, the court believes that she cannot realistically handle being a parent to more than two boys and possibly three girls.
Both children are in good foster homes and the foster parents would like to adopt. Carlos has become attached to his foster mother, who has been able to meet his special needs. Sheila has lived her entire life with, and become very attached to, her foster parents. It is true that termination of the parental rights to Sheila, coupled with the possible reunification of the older girls with the mother, would result in the separation of Sheila from Irma and Ada, with whom Sheila has grown up. But the court believes that Sheila's best interest is served by continuing her close relationship with her foster parents and allowing for the possibility that the foster parents will see fit, upon adoption, to let Sheila visit her sisters.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674,691, ___ A.2d ___ (1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
As stated in the section on reunification, DCF made reasonable efforts to reunify the mother with her children. DCF made only limited efforts to reunify the fathers in this case with their children, but this level of efforts was reasonable in view of the inability of the fathers to benefit from such efforts.
2) Whether DCF has made reasonable efforts to reunite the CT Page 711 family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The court did not enter expectations or specific steps for the fathers to meet because they were in prison. On January 16, 1997, the court entered the following expectations for the mother to meet to facilitate the return of the children to her custody: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the children as often as DCF permits, (4) participate in individual counseling (including the subject of domestic violence) and drug/alcohol counseling, 5) follow recommendations and provide random urine screens, 6) sign releases as requested, 7) secure and maintain adequate housing and income, 8) no substance abuse, and 9) no further involvement with the criminal justice system. The mother complied with some of the expectations, but did not visit the children as often as DCF permitted, abstain from drugs or fully participate in the prescribed counseling in 1997, or secure and maintain adequate housing and income. As detailed above, DCF substantially met its obligation to provide assistance.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The children have become attached to their foster parents. Carlos has no emotional ties to his natural parents. Sheila has some ties to her natural mother, but has a stronger bond with her foster parents.
5) The age of the child.
Sheila is three years old. Carlos is four years old. CT Page 712
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in the children's best interest to return to their home. The fathers' contact with the children and their care takers was limited. The mother's contact with her children was less limited but was of generally poor quality.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person, or from economic circumstances. The mother was the victim of domestic violence but this fact does not explain her limited relationship with Carlos, who lived at home only between May and November, 1995, and Sheila, who never lived at home. Further, the mother received domestic violence counseling and still denied that it was a problem.
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petitions. The court further orders that the Commissioner of DCF is appointed statutory parent for the children for the purpose of securing adoptive families. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law. CT Page 713
It is so ordered.
Carl J. Schuman Judge, Superior Court